BEST MEDIUM PUBLISHING CO., Inc.,
Plaintiff,

v.

NATIONAL INSIDER, INC., Defendant.

No. 63 C 848.

United States District Court
N. D. Illinois, E. D.

Oct. 28, 1966.

As Amended Jan. 5, 1967.

Daniel A. Becco, McKay, Moses, Mc-Garr & Gibbons, Chicago, Ill., for plaintiff.

Elmer Gertz, Chicago, Ill., for defendant.

## DECISION ON MERITS

ROBSON, District Judge.

Plaintiff, the Best Medium Publishing Co., Inc., is the publisher of a weekly newspaper, The National Enquirer. It sued the defendant, the National Insider, Inc., which is also the publisher of a weekly newspaper, The National Insider, for infringement of six articles which

had first appeared in plaintiff's publication and on which plaintiff had copyrights.

Defendant counterclaims as to six causes of action based on articles allegedly infringed by plaintiff's later publication of articles which defendant had first published and copyrighted.

The amended complaint originally asserted nine infringing articles by defendant. As to three of these, plaintiff withdrew its charges. Defendant argues it is entitled to the costs of preparing the case against these three articles, as well as to photographs no longer charged to be infringed, and for damages and attorneys' fees. Plaintiff also seeks damages, attorneys' fees and costs. Both parties pray for an injunction against future infringements.

Plaintiff's defense to the counterclaims is that it purchased the articles from the authors in good faith, without knowledge of any prior publication thereof, and upon the representation and warranty of the writer or his agent that the writer had the right to sell the articles to the plaintiff. Further, plaintiff pleads that neither its articles nor any parts thereof were copied from the defendant's articles, and plaintiff's articles are materially different from defendant's and its quotations were authorized. Plaintiff denies that defendant's articles were copyrighted by it, in that defendant submitted no proof of registration of copyright in regard to the articles covered by the counterclaims. Plaintiff began work on its articles before defendant's publication. As to the second cause of action alleged in the counterclaims, plaintiff's publication preceded defendant's. Finally, it contends that there is no similarity between plaintiff's articles and those asserted by defendant in its counterclaim.

The crux of the controversy seems to be the extent of the title which plaintiff acquired when it purchased articles from free lance writers for a few hundred dollars, and published the articles in its tabloid. Plaintiff insists that it purchased full title. Defendant maintains that under the custom and usages of the trade, plaintiff got only the right to *first* printing, and after that publication plaintiff's rights were exhausted and the author was free to sell the article to others for republication.

■ The court concludes that where no conditions are stated at the time of the sale of an article, the law implies that there is a complete sale of the article and the publisher has full rights thereto.

■ It would seem to be the law as established by the treatises that where an author sells an article to a periodical without specification of the rights he is conveying that he transfers his entire right to the publisher who has the right to a copyright thereon.

Thus, it is said in the law review article, "'Magazine Rights'—A division of Indivisible Copyright," 40 Cornell Law Quarterly, p. 411, at 438:

"In the absence of evidence to the contrary, the transfer by an author to a magazine publisher of a manuscript without restriction is deemed to carry with it all right, title, and interest, including all rights of copyright, therein."

The footnote (112) states that "The more modern authorities recognize that an author placing a work with a magazine publisher for publication without further explanation, presumptively intends that the publisher should secure copyright therein in its own name. * * No intention to transfer the proprietorship was presumed in the *older* cases." In the article, "Magazines, Newspaper and Syndication Problems," by Alfred H. Wasserstrom, found in 1953 Copyright Problems Analyzed (CCH), at 164, it is said:

"If a publisher buys the author's work for a certain sum and nothing more is said on the matter by the parties, or if no rights are expressly or by necessary implication reserved to the author, then the transaction will be considered an outright sale with right to copyright passing to the publisher."

In 18 Am.Jur.2d § 33 Copyright and Literary Property, it is said:

" * * * [A]s a general rule when an author sells a story outright to a publisher without any reservation, the publisher becomes the absolute owner thereof with full rights to copyright it and secure all the benefits of copyright accorded by the statute."

\* \* \* \* \* \*

" * * * When an author delivers a manuscript to a publisher and does not himself take out a copyright, there is no need of a formal assignment by him, mere delivery of the manuscript is sufficient."

In Lin-Brook Builders Hardware v. Gertler, 352 F.2d 298, at 300 (9th Cir. 1965), it is said:

" * * * [W]e believe that when one person engages another, whether as employee or as an independent contractor, to produce a work of an artistic nature, that in the absence of an express contractual reservation of the copyright in the artist, the presumption arises that the mutual intent of the parties is that the title to the copyright shall be in the person at whose instance and expense the work is done."

It is apparent that defendant's alleged infringements of plaintiff's articles occurred after the lapse of quite a period of time, whereas but a few weeks' interval passed between plaintiff's publication of the items alleged to infringe in defendant's counterclaims.

Plaintiff's publication has a circulation of over a million; defendant's, some 20,000 to 30,000.

The six articles which plaintiff presently charges to have been infringed are:

1. "How a Man and A Medal...Gave H.S.T. A Big Problem" published in the Enquirer under date of December 28, 1958, and in the Insider on April 7, 1963.

2. "It Pays To Be Stingy Says Groucho Marx" published in the Enquirer under date of August 12, 1962, and in the Insider on April 7, 1963.

3. "Name-Calling Can't Bother Me, Says James Mason...I'm Used to Being Hated" published in the Enquirer under date of April 23, 1961, and in the Insider under date of February 1, 1963.

4. "I'm a Loser...Says George Raft" published under date of October 29, 1961, in the Enquirer, and in the Insider on November 10, 1963.

5. "Couples In Miami Get Gassed Up & Married" published in the Enquirer under date of August 5, 1962, and in the Insider January 19, 1964.

6. "John Wayne Says: He-Men Are Dying Out" published in the Enquirer under date of November 12, 1961, and in the Insider February 2, 1964.

The six articles charged by the counterclaims to have been infringements by plaintiff are:

1. "Diesel Engine 'Swiped' By An Armless Boy!" published by the Insider under date of November 17, 1963, and in the Enquirer December 8, 1963. (Plaintiff states the article appeared in its Sports Edition November 24, 1963.)

2. "Boy Hikes 50 Miles On One Leg" published in the Insider November 17, 1963, and in the Enquirer November 24, 1963. (Plaintiff alleges it first published the article November 10, 1963, in its Sports Edition.)

3. "Missed Her Man So Much She Broke Into Prison To Free Him" published in the Insider January 19, 1964, and in the Enquirer March 15, 1964.

4. "Her Family Lived Just a Jiggle Away From Death" published in the Insider February 2, 1964, and in the Enquirer March 22, 1964.

5. "Child Stands On The Brink Of A Disaster" published in the Insider under date of March 15, 1964,

and in the Enquirer on April 26, 1964.

6. "Convicts Endanger Health to Help A Girl Walk" published in the Insider under date of April 5, 1964, and in the Enquirer April 19, 1964.

Plaintiff maintains that ignorance of infringement is no defense (De Acosta v. Brown, 146 F.2d 408 (2 Cir. 1944). Furthermore, some of the exhibits in the case were published by defendant *after* the service of summons herein, and that an editor of defendant admitted that prior to publication in the Insider he had seen a clipping pertaining to the story in the Enquirer, all of which is indicative of willful infringement.

The evidence presented by the litigants is in complete conflict—defendant's adamantly supporting its contention that only "first rights" were sold plaintiff, and plaintiff's evidence substantiating its position that it purchased complete rights, otherwise it would refuse to purchase.

Defendant's evidence supports its position that free lance authors could not afford to research and write articles for the paltry sums paid, unless they were permitted to sell for republication in other tabloids. It points out that in publications of the nature here involved that readers' memories are short and republication is not detrimental to the rights of the holder of first publication rights.

Plaintiff's evidence would support the conclusion that it researched both in its own "morgue" and through other sources to ascertain whether the article submitted had been theretofore published elsewhere, before it would accept the article and publish it.

While the court is no expert judge of the monetary value of the articles appearing in the respective tabloids and hesitates to deprecate their literary merit, it would seem that great literary skill and impeccable accuracy are not the aims of the parties, but rather sheer readability, eye-catching technique and a matter of attractiveness of style are desired, rather than perseverance for high literary quality demanding long rewriting and researching to achieve perfection. Therefore the author's cost should not be as tremendous as defendant indicates.

There can be no doubt that defendant's evidence supports its contention that there is an established custom and usage that free lance authors selling to a tabloid sell only first rights. Its editor, Mr. Robert Borzello, emphatically stated that

"Opinion as far as custom and usage regarding the purchase of rights is unanimous, so there is no ambiguity the publisher must specifically state what rights he is purchasing. If he does not state what rights he is purchasing and the writer does not state what rights he is selling, then he is purchasing first North American rights only, in the opinion of some. And in the opinion of others he is purchasing one-time usage only. * *

"Not once did anyone familiar with the custom and usage in the trade ever state to me that it was to the publisher's advantage or to the writer's advantage to leave the question open to dispute and not stipulating the rights. And only rarely did the editor or publisher contend that if the writer did not specify what he was selling, that the editor could assume that he was purchasing additional or all rights."

He further testified that he was told by author Diehl that "he never sold all rights to his material whether to The National Enquirer or to anyone else." Further, "He said they never asked him for all rights and he said that he told them that he was selling them only one-time usage." He stated he was told by author Isaac Jones that he "never sold the Enquirer all rights. He sold first publication rights only." Borzello further stated that

"It is also understood in the trade that BIPS, like nearly all agencies and free-lancers, unless otherwise expressly agreed, sells one-time use only, unless stated exclusively, they don't even sell firsts or exclusive use."

\* \* \* \* \* \* \*

"A newspaper or magazine is primarily interested in first publication, not necessarily exclusive publication, in an article. Unlike book publishing, once a story is published in a newspaper or a magazine it is generally considered dead within a few days or weeks. \* \* \* The only reason to retain all rights is to resell their material to other publications after using it and therefore earn extra money." Frank Kulla, who had formerly worked for plaintiff in an editorial capacity, disclosed to Borzello that there "was no established Enquirer policy regarding purchase rights. Whatever the editor who purchased the article wanted, that was what he secured. \* \* \* He has personal knowledge that in dozens of instances he saw material purchased by the various authors on which was stamped or typed, 'First North American Rights Only.' This did not deter them from purchasing such material."

Further, there was evidence that Churchill Semple, a free lance writer formerly with Enquirer, had an understanding with Enquirer's Chet Whitehorn that he was "only selling first North American rights to the Enquirer. \* \* \* He arrived at his understanding with the Enquirer through his conversations on the subject with Chet Whitehorn. He would further testify that he is familiar with custom and usage in the tabloid industry and to his knowledge when nothing is said with respect to what is sold or acquired it is only one-time usage."

For what weight it merits, it might be stated that both Semple and Whitehorn were asked to leave plaintiff's employ.

On the other hand, Mr. Edward Mutch testified by deposition that he is managing editor of plaintiff's newspaper, and that when he talked to Semple he told him that "any story he would write for the Enquirer would belong to the Enquirer, and he must not sell any story to any other publication, and I told this to every writer and it was a firm agreement, all writers will confirm this."

Mr. James Allen, who had formerly been employed by National Enquirer for some five years, stated that when, as managing editor, he purchased stories he "followed the general policy of purchasing all rights to stories, except in specific cases involving special syndicated material which was offered to us for exclusive use in the United States and Canada. \* \* \* [I]n the event that any author indicated that he wished to reserve any rights to his material, we wouldn't bother pursuing the subject further. As to the Mayfield-Truman article \* \* \* I don't recall any notation on the manuscript of this particular story whereby the author reserved any rights whatsoever. Normally if an author wishes to do so it is common practice in the industry for him to make such a notation. If Mr. Diehl had so indicated that he wished to reserve certain rights I would not have negotiated with him to buy the story."

The deposition of Denis Brian, an employee of plaintiff for three years, revealed in response to the question, "Did you have any discussion as to the period of time in which the National Enquirer might be said to have exclusive rights?" that he "understood they would have exclusive rights in North America indefinitely."

When asked whether he ever made a separate copyright of the article he wrote for the National Enquirer, Brian answered that it was his understanding that the Enquirer had the copyright for the whole of North America. He also stated he knew of no article of his that had appeared in any tabloid newspaper other than the National Enquirer in the United States.

The deposition of Carl E. Grothmann, editor of the plaintiff's tabloid and its "chief editorial employee" testified as to its method of operation, the procuring of copyrights, the publication of its newspaper, and its source of materials. He stated that in the purchase of articles the agreement was verbal in most instances, although sometimes there were formal contracts of purchase. He gave his un-

derstanding of some phases of copyright law, that "[l]imited segments of an article can be reproduced by another newspaper under the term 'fair usage.'" He further understood that an author of an article could permit another publication of it only if "he has sold only first rights to a publication." He said he was not aware that in publications in the tabloid field that first publication rights only were sold. Further, that if nothing were stated on the check as to the rights sold, it would depend on the agreement with the author—a verbal agreement—which could differ from author to author. He did not know that some of his writers were reselling their articles for later publication. In answer to the question whether he recalled ever telling any of his writers that they could not sell their articles for later publication, that "[s]ome of them have been told that if they sell material accepted by us elsewhere, we will no longer do business."

Plaintiff submitted that Mr. Stanley Rothenberg, an expert in the field of copyrights—a fact not conceded by defendant—had reviewed the exhibits in this case and would testify that in his opinion there had been copying by defendant of plaintiff's exhibits. It was further indicated by plaintiff that in answer to the question "What rights are retained by the author, and what rights are retained by the periodical?" where an author submits an article to a periodical and a check issued without legend, he would answer, "All periodical rights are retained by the periodical." This answer was based upon his experience in representing writers, authors, motion picture producers and purchasers of rights from authors.

Mr. Theo C. Bernsen's deposition was taken. He stated he is managing editor of Bernsen's International Press Service, Limited (BIPS), an English concern which works free lance and sells photo-feature stories in a number of countries, where the articles are sold for one-time publication, or single publication. He stated he would not sell all rights because that would incorporate world rights, and he has never sold all North American rights to a story. He stated he had never sold to the National Enquirer more than a one-time use. He said plaintiff had never asked for the purchase or sale of a copyright, which is actually against normal practice; that the custom and usage is to sell only a single use. He stated further:

"* * * [N]o publisher would ever do any such thing unless in very special circumstances, but that has nothing to do with free-lance produced material. It may have to do with assignments given by a publisher to a particular free-lancer somewhere or other. He may then require and expect for that matter, world copyright, if the price is right.

"Q. Do I understand correctly that the only time there would be a license for more than one-time use would be if there were special negotiations for that purpose?

"A. Yes."

The English invoices all had the printed language on them—"To Single Reproduction Rights."

Mr. Bernsen stated that no free-lance organization or free-lancer could ever live on the proceeds of a one-time sale to one particular magazine or client, and that the articles had to be sold a number of times in order to meet their overhead. He testified that "it is common practice to establish the respective rights of the parties verbally * * * and when you don't say anything, I mean you don't refer to very specific rights or very specific things, that it goes on the terms of single publication rights of a story." He also said that it meant nothing when the check sent in payment had on it "all rights" because it was totally irrelevant, because "when we sell everybody knows you sell for one time publication rights." As to free lance authors he stated that when "a specific story [is] done, and they wanted to have all rights * * * [w]ell, then of course when the price is right you have authors who sell that article with all rights, but I don't think that I have met any author of any con-

sequence who would sell an outright story for $100 or $200, or whatever. That is immediately a question of $1,000, $2,000, $3,000, $5,000."

In appraising the evidence, the court did not have the advantage of weighing the credibility of much of the testimony inasmuch as it was presented in deposition form. There was the further element of ill-feeling between some of the witnesses and deponents which might detract from the value to be accorded their statements, or at least colored their approach.

█ The respective statures, circulation wise, of plaintiff and defendant; the long interval between the appearance of the similar articles in defendant's tabloid and plaintiff's newspaper, contrasted with the brief interval between the allegedly similar articles later appearing in plaintiff's paper after publication in defendant's newspaper; the not insubstantial amount paid the free lance writers for plaintiff; the established principle of law that where no terms are agreed upon on the sale of an article the law presumes no reservation of right in the author; the positive testimony of plaintiff's editor that the article would generally not be purchased absent a sale of complete rights by the author, all lead the court to conclude that plaintiff should prevail on its amended complaint.

It is further the court's conclusion that there is not sufficient evidence of infringement by plaintiff of defendant's articles asserted in its counterclaims; in fact, the evidence would indicate the contrary, and the counterclaims are therefore held without merit.

The issue of damages is a difficult one to resolve inasmuch as there is no evidence of the extent thereof. The parties cite the statute, 17 U.S.C. § 101(b), providing a maximum of $5,000 and a minimum of $250 damages for infringement of copyright, and seek the maximum. The Supreme Court in F. W. Woolworth Co. v. Contemporary Arts, Inc., 344 U.S. 228, 73 S.Ct. 222, 97 L.Ed. 276 (1952), discussed the purpose of the statutory

maximum and minimum and the virtue of the statutory scheme of having the court exercise its discretion in setting the recoverable amount in this difficult field. It was said, at 233, 73 S.Ct. at 225:

"* * * Even for uninjurious and unprofitable invasions of copyright the court may, if it deems it just, impose a liability within statutory limits to sanction and vindicate the statutory policy."

The court quoted from an earlier case, at 232, 73 S.Ct. at 225, saying:

"'In other words, the court's conception of what is just in the particular case, considering the nature of the copyright, the circumstances of the infringement and the like, is made the measure of the damages to be paid, but with the express qualification that in every case the assessment must be within the prescribed limitations, that is to say, neither more than the maximum nor less than the minimum. Within these limitations the court's discretion and sense of justice are controlling * * *.'"

█ The court concludes that plaintiff's damages for infringements of its copyright are not really substantial. Plaintiff had reaped the benefit of its publications. That profit was not diminished by the much later publications of similar articles by defendant. Plaintiff, of course, has the right to have the integrity of its copyrights upheld, and an injunction should assure it of the protection of its rights in the future. The court is of the opinion that the minimum statutory provision for damages should be here applicable.

█ Both plaintiff and defendant have sought recovery of attorneys' fees. The court is of the opinion that this is not a case where such a recovery should be allowed on either side. As the late Justice Sherman Minton pointed out in a decision while on the Seventh Circuit Court of Appeals in the case of Official Aviation Guide Co. v. American Aviation Associates, 162 F.2d 541, 543 (1947),

"The * * * statute * * * is wholly discretionary as to extraordinary costs of attorneys' fees." It could be added that the instant case was, like that cause, "hard fought and prosecuted in good faith." Also, the court in this case believes that, as in that case, "The defendants' counterclaim was merely an instrumentality of defense and was asserted only to ward off the assault of the plaintiff. It was an alternative defense. * * *"

Both counsel have shown extreme industry and resourcefulness. The court believes, however, that each party should bear its own attorneys' fees.

■ The recovery of costs being mandatory in favor of the prevailing party, the plaintiff will recover its costs. An injunction against future infringements of plaintiff's copyrights by defendant will issue. Plaintiff will submit an appropriate final decree within ten days. This decision will stand as the court's findings of fact and conclusions of law.